970 So.2d 727 (2007)
Danny Lee WILLIAMS, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-01850-COA.
Court of Appeals of Mississippi.
September 4, 2007.
Rehearing Denied December 11, 2007.
*728 David L. Walker, attorney for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
Before MYERS, P.J., ISHEE, ROBERTS and CARLTON, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. A jury sitting before the Panola County Circuit Court found Danny Lee *729 Williams guilty of three counts of fondling a child and six counts of sexual battery. The circuit court sentenced Williams as follows:
Fifteen years for count I;
Five years for count II, to run concurrently with count I;
Five years for count III, to run concurrently with counts I and II;
Five years for count IV, to run consecutively to counts I, II, and III;
Five years for count V, to run concurrently with count IV;
Five years for count VI, to run concurrently with counts IV and V;
Five years for count X, to run concurrently with counts IV, V, and VI;
Five years for count XI, to run concurrently with counts IV, V, VI, and X, and;
Five years of post-release supervision for count XII, to run consecutive to counts IV, V, VI, X, and XI.
Following unsuccessful post-trial motions for JNOV or, alternatively, for a new trial, Williams appeals and raises four issues, listed verbatim:
I. THAT THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO TESTIMONY FROM TOMIKO MACKEY CONCERNING THE BELIEVABILITY OF [JANE].
II. THAT THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE INTRODUCTION INTO EVIDENCE OF THE VIDEO TAPE RECORDING OF [JANE] AND TOMIKO MACKEY.
III. THAT THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE ACCEPTANCE OF TOMIKO MACKEY AS AN EXPERT WITNESS IN THE FIELDS OF FORENSIC INTERVIEWING, USING FINDING WORDS TECHNIQUE AND CHILD SEXUAL ABUSE.
IV. THAT THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR A NEW TRIAL AND IN THE ALTERNATIVE FOR A JUDGMENT NOT [SIC] WITHSTANDING THE VERDICT.
Finding no error, we affirm.

FACTS
¶ 2. This case centers on a stepfather's inappropriate conduct with his stepdaughter. Danny Lee and Sandra Williams married in 2002. Sandra had a daughter, Jane, from a previous relationship.[1] Williams worked two jobs. At nights, he worked as a police officer with the Lambert Police Department.
¶ 3. On February 19, 2006, Sandra and Jane dropped Williams off at work. During the return trip, Sandra and Jane discussed Jane's cell phone use. Jane had been borrowing Sandra's cell phone and Sandra wanted to know why. Additionally, Sandra wanted to know why Jane was using the phone late at night. It was then that Jane told Sandra that Williams had been touching her inappropriately for some time.
¶ 4. Sandra did not immediately notify anyone in law enforcement. However, Sandra contacted authorities the very next day. Sandra first spoke with Officer Michael Harden of the Batesville Police Department. *730 She gave the following statement:
Yesterday, February 19, my daughter, [Jane], informed me that my husband, Danny Lee Williams, has been molesting her while I was asleep. This, of course, disturbed me and I asked her to tell me details. Slowly she has been telling me that when he would get off work from his second job that he would come into her room and touch her breast and private area. She also said that he said, "This is how you do your boyfriend." She had to rub on his penis and even stick it in her mouth. He would lay on her and play his penis around her vagina. He would even cum but not in her. He would only leave her alone if he thought her period was on. He said, "This is our secret, don't tell mom or anybody else."
¶ 5. On February 22, 2006, Captain Paul Shivers, a detective with the Batesville Police Department, visited Sandra's home. Captain Shivers gave Sandra equipment by which she could record phone conversations. Captain Shivers taught Sandra how to use the equipment. The intended goal was to record Williams's phone conversations with Jane.
¶ 6. Based on the record, it appears that Sandra and Jane recorded more than one of Williams's phone calls. During those phone calls, at Sandra's instruction, Jane hinted to Williams that she was pregnant. According to trial testimony, Williams became "nervous." Sandra later returned the equipment and the taped conversations to Captain Shivers.
¶ 7. Captain Shivers referred Sandra and Jane to the Department of Human Services office in Sardis, Mississippi. There, they met with Bonnie Jean Rogers, a social worker who investigates child neglect and child abuse. Because the Panola County Department of Human Services did not have the required video and audio setup, Rogers referred Sandra and Jane to the Family Crisis Center in Oxford, Mississippi.[2]
¶ 8. At the Family Crisis Center, Jane met with Tomiko Mackey, a "forensic interviewer." Mackey interviewed Jane pursuant to a particular method designed to determine whether Jane's version of events was consistent with a child who had suffered sexual abuse. Mackey recorded the forensic interview on audio and video equipment. Additionally, four people watched the interview through a two-way mirror. Those four people included Rogers and Captain Shivers, as well as additional staff members of the Panola County DHS and the Family Crisis Center. After the interview, Mackey concluded that Jane's version of events was consistent with that of children who suffered sexual abuse.

PROCEDURAL HISTORY
¶ 9. On April 26, 2006, the Panola County grand jury returned an indictment against Williams and charged Williams with three counts of gratification of lust and nine counts of sexual battery. Williams pled not guilty and proceeded to trial.
¶ 10. Williams's trial commenced on August 21, 2006. The prosecution called Sandra, Jean Rogers, and Tomiko Mackey during the first day of trial. As will be discussed, Williams takes issue with the circuit court's decision to allow the prosecution to call Mackey as an expert witness. Additionally, the prosecution submitted Jane's taped interview during Mackey's *731 testimony. Williams objected on the basis that he did not have an opportunity to confront Jane during the forensic interview. The next morning, the prosecution called Jane and Captain Shivers. The prosecution rested after Captain Shivers testified.
¶ 11. At that point, Williams moved to dismiss counts seven, eight, and nine of the indictment. Those counts alleged that Williams digitally penetrated Jane's vagina. However, Jane testified that Williams never digitally penetrated her. The circuit court granted Williams's motion to dismiss counts seven, eight, and nine. Accordingly, Williams faced nine counts, rather than twelve.
¶ 12. Williams proceeded to present his case-in-chief. Williams first called Jane. After brief testimony from Jane, Williams took the stand. Williams testified that he never touched Jane inappropriately. During cross-examination, Williams explained his comments during the recorded phone conversations:
Q. Now, once again [Jane] is talking to you on the phone and you keep asking, "She know what's going on? She know what's going on?"
A. Yeah, that's her mother's voice.
Q. That wasn't [Jane]?
A. You said she kept asking if she knows what's going on. That was her mother asking what's going on.
Q. And what did Sandra want to know what's going on?
A. What was going on with her daughter. I was trying to find out as well as she was.
Q. Danny Williams, didn't you say  you asked, "Does she know what's going on?"
A. Did her mother know what's going on or did [Jane] know what's going on?
Q. Well, [Jane] knew what was going on, didn't she?
A. Apparently she didn't because her mother had to put her up to it.
Q. Okay. And [Jane] keeps saying, "Should I tell her? Should I tell her? Should I tell her?" What was your answer?
A. No.
Q. Your answer was, "No. Wait until I get home."
A. Right.
Q. Now, why did you want [Jane] to wait until you got home before she told her momma?
A. Because everything we discussed we did as a family matter. We never discussed any business over the phone. We try to discuss equal business and whatever [Jane] had to say to me, we are going to find out and be right in front of the mother as well.
Q. All right. Now, I believe there are some other things on this tape that were of interest, don't you agree?
A. Perhaps.
Q. Perhaps?
A. Perhaps it may be.
Q. [Jane] tells you, "I want to tell her." [Jane] says, "I got to tell her." What was your answer?
A. Don't tell her and wait until I get home because everything we did, we did as a family.
Q. No, that wasn't your answer. Your answer was, "You can't." Now, why did you tell [Jane] she couldn't tell?
A. Because what we talk about we talk about among one another.
The prosecutor then related an exchange from the last recorded call in which Jane told Williams she was pregnant. The following exchange then occurred:

*732 Q. [Jane] says, "You know it's yours." Do you remember what your answer was?
A. Actually, I don't but it shouldn't have been mine.
Q. "I'll explain it for you. Okay? We'll get that fixed." What does that sound like?
A. That means that once I get to the house and sit down and find out who she been messing with and explain to her momma because she did have boyfriends that we did allow her to see.
Williams rested after he concluded his testimony and the circuit court adjourned for the day.
¶ 13. The next morning, Williams and the prosecution submitted jury instructions. At approximately 10:30 a.m., the jury retired to deliberate. Approximately one hour later, the jury returned guilty verdicts on all nine counts.
¶ 14. On September 22, 2006, the circuit court conducted a hearing on Williams's post-trial motions for JNOV or, alternatively, for a new trial. The circuit court ultimately overruled Williams's post-trial motions and sentenced Williams incident to all counts. Aggrieved, Williams appeals.

ANALYSIS
I. THAT THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO TESTIMONY FROM TOMIKO MACKEY CONCERNING THE BELIEVABILITY OF [JANE].
¶ 15. Here, Williams claims the circuit court erred when it allowed the prosecution to elicit Mackey's testimony that she found Jane's version of events consistent with a child who had been sexually abused. In considering this issue, we are mindful of our familiar abuse of discretion standard. Burton v. State, 875 So.2d 1120(¶ 6) (Miss.Ct.App.2004). We will find an abuse of discretion where a defendant demonstrates clear prejudice resulting from an undue lack of constraint on the prosecution. Id. Additionally, we will reverse the circuit court if we find its decision to be clearly wrong. Id.
¶ 16. The testimony at issue transpired during the following exchange:
Q: [Mr. Kelly, for the prosecution] And did you, in fact, conclude your interview with Jane?
A: Yes, I did.
Q: Was [Jane] believable?
MR. WALKER [For Williams]: Judge, I object. That is a question for the jury to determine.
MR. KELLY: I think it is an opinion that she can render.
THE COURT: I think this witness can, in fact, render that opinion. I would overrule.
MR. WALKER: Judge, I then object for the record. I think it is beyond the scope of an actual witness.
THE COURT: I think this witness can give her opinion. Ladies and gentlemen of the jury, you are not bound by it just like you are not bound by the opinion of any witness. I mean, a brain surgeon can come in here and testify and that doesn't tie the jury down to that witness's opinion of being absolute. You still have the right to weigh and give credibility and believability to all witnesses, experts included, but this witness has been qualified as an expert, so I think she can give you the benefit of her opinion for whatever weight you think it is entitled to.
Q: Did you form an opinion as to the believability of Jane?
A: I did form an opinion, yes.

*733 Q: What was that opinion?
A: Based on Jane's disclosure and based upon her reported experiences of sexual abuse, my finding was her report was consistent with a child who had been sexually abused.
¶ 17. Williams bases his argument on the premise that Mackey's expert opinion was an opinion on Jane's credibility and was, therefore, inadmissible because it invaded the province of the jury and was unhelpful to its determination. "It is true that, in a child abuse case, a witness's opinion that the alleged victim was telling the truth is of dubious competency and, therefore, is inadmissible." Lattimer v. State, 952 So.2d 206(¶ 40) (Miss.Ct.App. 2006). While the prosecutor's question called for an improper answer when he asked Mackey whether she found Jane believable, Mackey's answer, however, was not improper. Mackey responded, "Based on Jane's disclosure and based upon her reported experiences of sexual abuse, my finding was her report was consistent with a child who had been sexually abused." We have held that such answers are not vouchers of credibility. See, e.g., Elkins v. State, 918 So.2d 828(¶ 9) (Miss.Ct.App. 2005). Accordingly, we find no abuse of discretion in the circuit court's decision to overrule Williams's objection.
II. THAT THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE INTRODUCTION INTO EVIDENCE OF THE VIDEO TAPE RECORDING OF [JANE] AND TOMIKO MACKEY.
¶ 18. In this issue, Williams submits that the circuit court erred when it allowed the prosecution to introduce the videotaped interview between Mackey and Jane. According to Williams, the circuit court's decision amounted to a violation of Williams's right to confront witnesses against him. In the previous issue, we discussed our standard of review regarding a circuit court's decision to allow the introduction of evidence. For brevity's sake, we will not repeat it.
¶ 19. Williams relies on the United States Supreme Court's decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In Crawford, the United States Supreme Court held that:
the Confrontation Clause of the Federal Constitution's Sixth Amendment bars the admissibility of out-of-court testimonial statements by an unavailable witness offered in a criminal trial to prove the truth of a matter asserted (also known as hearsay) unless the defendant has had a prior opportunity to cross-examine the witness about the statement.
Frazier v. State, 907 So.2d 985(¶ 36) (Miss. Ct.App.2005). As a result, "testimonial hearsay must be exposed to confrontation by way of cross-examination prior to reaching admissible status, while non-testimonial hearsay does not trigger the need for confrontation to be admissible." Id. at (¶ 39). "Thus, our application of Crawford to the present facts depends upon a determination of whether the evidence admitted is `testimonial.'" Id. Crawford declined to provide a firm definition of "testimonial" evidence. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Even so, Crawford did provide examples of "testimonial" evidence. Id. According to Crawford, prior testimony at a preliminary hearing, before a grand jury, or at a former trial and prior testimony during police interrogations, are all examples of "testimonial" evidence. Id.
¶ 20. As a threshold matter, we must first determine whether the evidence at issue qualifies as "hearsay." Under Rule 801(c) of the Mississippi Rules of Evidence, "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in *734 evidence to prove the truth of the matter asserted." (internal quotations omitted). "Hearsay is not admissible except as provided by law." M.R.E. 802. The prosecution played the video before the jury. The operative substantial information on the video came from Jane. Jane was certainly not testifying at a trial or a hearing at the time. If the prosecution offered the videotaped interview for any purpose other than the truth of the matter asserted  that Williams engaged in inappropriate conduct with Jane  then that purpose is not among the record. Accordingly, we must conclude that the videotaped interview was most certainly hearsay.
¶ 21. Having found such, we must now determine whether the videotape was "testimonial" as contemplated by Crawford. A videotaped forensic interview incident to allegations of sexual abuse is not one of the examples of "testimonial" hearsay discussed in Crawford. However, those examples were not meant to be exhaustive.
¶ 22. The interview at issue occurred at a non-profit, non-governmental entity. However, the interview arose based on a report to a police department and a referral to the Panola County Department of Human Services, which, due to a lack of proper recording equipment, then referred Jane to the Family Crisis Center. A law enforcement officer observed that interview, after having gathered evidence by recording phone conversations. Based on the fact that law enforcement was intimately involved in obtaining the interview and was present at the interview, we conclude that this videotaped forensic interview was testimonial in nature, as contemplated by Crawford. See Snowden v. State, 156 Md.App. 139, 846 A.2d 36, 47 (Ct.Spec.App.2004) (statements of minors to social worker were "testimonial" because they were made for purpose of developing testimony for trial); T.P. v. State, 911 So.2d 1117, 1123 (Ala.Crim.App.2004) (minor's statements were result of interview conducted by social worker and investigator as part of criminal investigation and, because interview was intended to be used as investigative tool for potential criminal prosecution, interview was similar to police interrogation and thus fell within definition of "testimonial" as contemplated by Crawford).
¶ 23. That is not the end of the analysis. Testimonial hearsay must be subjected to cross-examination before it may be admissible. Williams did not get to cross-examine Jane prior to the admission of the videotaped forensic interview. However, we cannot find that Williams was unduly prejudiced because Williams cross-examined Jane later during the trial and even called Jane during his case-in-chief. Williams had the opportunity to question Jane about her statements on the videotape and in general. Accordingly, though we find error, we find it harmless beyond a reasonable doubt.
III. THAT THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE ACCEPTANCE OF TOMIKO MACKEY AS AN EXPERT WITNESS IN THE FIELDS OF FORENSIC INTERVIEWING, USING FINDING WORDS TECHNIQUE AND CHILD SEXUAL ABUSE.
¶ 24. In this issue, Williams claims the circuit court erred when it allowed the prosecution to submit Mackey as an expert witness in forensic interviewing, using a technique called "Finding Words," and in child sexual abuse. Rule 702 of the Mississippi Rules of Evidence governs admissibility of expert opinions. Pursuant to M.R.E. 702:
If scientific, technical, or other specialized knowledge will assist the trier of *735 fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
"While an expert may not opine that an alleged child sex abuse victim has been truthful, the scope of permissible expert testimony under Rule 702 includes an expert's opinion that the alleged victim's characteristics are consistent with those of children who have been sexually abused." Lattimer, 952 So.2d at (¶ 38).
¶ 25. The prosecution asked Mackey to discuss her credentials and "forensic interviewing" in general. Mackey testified that she was a licensed clinical social worker with a bachelor's degree in psychology and a master's degree in social work with an emphasis in children, youth, and families. Mackey received training in forensic interviewing through a program called "Finding Words." At the time of trial, she was a member of the National Association of Social Workers and the American Professional Society on Abuse of Children. She also testified that she had attended workshops and programs on child sexual abuse, lectured at the University of Mississippi on the subject of child sexual abuse, and that she had been accepted as an expert witness in the fields of child abuse and forensic interviewing. When the prosecution tendered Mackey as an expert in forensic interviewing, using the "Finding Words" technique, and child abuse, Williams conducted additional voir dire.
¶ 26. During Williams's voir dire, Mackey testified that, on occasion, she had been accepted as an expert in both forensic interviewing and child sexual abuse and, sometimes, only as an expert in forensic interviewing, depending on the circumstances. She also testified that she had no published articles and that she was not a member of any national forensic interviewing association.[3] Ultimately, the circuit court overruled Williams's objection and allowed Mackey to testify as an expert witness.
¶ 27. Applying the standards of M.R.E. 702, and our familiar standard of review, we cannot conclude that the circuit court abused its discretion or that its decision to accept Mackey as an expert witness was clearly wrong. Mackey possessed specialized knowledge through her education, training, and her professional experience in the field of forensic interviewing. Additionally, her knowledge in the form of her opinion, could have been helpful to the jury in deciding whether Jane was sexually abused by Williams. We also agree with the circuit court that Mackey's opinion was based on sufficient facts, and that her testimony was the product of reliable principles and methods. Further, we can find no indication that Mackey failed to reliably apply the principles and methods of forensic interviewing to the facts of the case. Mackey was suitably positioned to opine that characteristics of Jane's interview statements were consistent with sexually abused children.
IV. THAT THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION FOR A NEW TRIAL AND IN THE ALTERNATIVE FOR A JUDGMENT NOT [SIC] WITHSTANDING THE VERDICT.
¶ 28. Finally, Williams contends that there was insufficient evidence to support *736 the verdict and that the verdict was contrary to the overwhelming weight of the evidence. In considering Williams's contention that there was insufficient evidence to support the verdict, we must consider all of the evidence, not just the evidence which supports the State's case, in the light most favorable to the State. May v. State, 460 So.2d 778, 781 (Miss.1984). If there is substantial evidence in the record of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions regarding the guilt of the defendant, we have no authority to disturb the jury's verdict. Id.
¶ 29. The jury heard ample evidence to convict Williams. The jury heard Jane's testimony in which Jane described the various inappropriate ways Williams touched her. The jury also heard Williams's recorded phone conversations with Jane. Accordingly, we cannot find that the circuit court erred when it overruled Williams's motion for JNOV.
¶ 30. In claiming that the verdict was contrary to the overwhelming weight of the evidence, Williams takes issue with the circuit court's decision to overrule his motion for new a trial. "A motion for a new trial seeks to vacate the judgment on grounds related to the weight, not sufficiency, of the evidence." Verner v. State, 812 So.2d 1147(¶ 6) (Miss.Ct.App.2002). Further, "[a] motion for a new trial is addressed to the trial court's sound discretion." Fleming v. State, 732 So.2d 172(¶ 37) (Miss.1999). This Court may only reverse the circuit court's decision if the circuit court abused its discretion when it overruled Williams's motion for a new trial. Smith v. State, 868 So.2d 1048(¶ 11) (Miss.Ct.App.2004).
¶ 31. True enough, Williams testified that he did not ever touch Jane inappropriately. However, as we discussed above, there was ample evidence to support the jury's resolution. "Matters regarding the credibility and weight to be accorded the evidence are to be resolved by the jury." Verner, 812 So.2d at (¶ 7). "Where there is conflicting testimony, the jury is the judge of the credibility of the witnesses." Bessent v. State, 808 So.2d 979(¶ 21) (Miss. Ct.App.2001). The testimony of a single uncorroborated witness can sustain a conviction even though there may be more than one witness testifying to the contrary. Verner, 812 So.2d at (¶ 7). Accordingly, we find no merit to this issue.
¶ 32. THE JUDGMENT OF THE PANOLA COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, GRATIFICATION OF LUST, AND SENTENCE OF FIFTEEN YEARS; COUNT II, GRATIFICATION OF LUST, AND SENTENCE OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT I; COUNT III, GRATIFICATION OF LUST, AND SENTENCE OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNTS I AND II; COUNT IV, SEXUAL BATTERY, AND SENTENCE OF FIVE YEARS TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS I, II, AND III; COUNT V, SEXUAL BATTERY, AND SENTENCE OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT IV; COUNT VI, SEXUAL BATTERY, AND SENTENCE OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNTS IV AND V; COUNT X, SEXUAL BATTERY, AND SENTENCE OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS IV, V, AND VI; COUNT XI, SEXUAL BATTERY, AND SENTENCE *737 OF FIVE YEARS TO RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS IV, V, VI, AND X; AND COUNT XII, SEXUAL BATTERY, AND SENTENCE OF FIVE YEARS OF POST-RELEASE SUPERVISION TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS IV, V, VI, X, AND XI, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] We use a fictitious name to protect Jane's identity. Counts one through twelve in the indictment charged various sex offenses when Jane was between twelve and fourteen years old.
[2] The Family Crisis Center is a non-profit private agency. It provides free forensic interviewing services, therapy services, and parenting classes.
[3] To be entirely clear, Mackey also testified that no such organization existed.